656 F.Supp. 776 (1987)
Eric Scott WILL and Anne M. Will, Plaintiffs,
v.
UNITED STATES of America, Defendant.
No. S85-0079C.
United States District Court, E.D. Missouri, Southeastern Division.
February 10, 1987.
Thomas H. Hearne, Steelman, Hearne & Hearne, Salem, Mo., for plaintiffs.
Joseph B. Moore, Asst. U.S. Atty., St. Louis, Mo., for defendant.

MEMORANDUM
WANGELIN, District Judge.
This matter is before the Court for a decision on the merits following a three-day trial ending October 22, 1986. Plaintiffs seek damages pursuant to the Federal Tort Claims Act for injuries sustained by plaintiff Eric Scott Will while swimming in the Ozark National Scenic Riverway Park.
After consideration of the testimony adduced at trial, the evidence introduced, the *777 briefs of the parties, and the applicable law, the Court makes and enters the following findings of fact and conclusions of law.
Any finding of fact equally applicable as a conclusion of law is hereby adopted as such, and any conclusion of law equally applicable as a finding of fact is hereby adopted as such.

Findings of Fact
1. Plaintiff Eric Scott Will is a citizen of Missouri and was two weeks short of his seventeenth birthday at the time of the accident, which is the subject of this lawsuit.
2. Plaintiff Anne M. Will is a citizen of Missouri and is the mother of Plaintiff Eric Scott Will (Eric).
3. Defendant is the United States of America and is being sued pursuant to the Federal Tort Claims Act.
4. The Flying W is a bend in the Current River where the channel of the river has created a natural swimming hole next to a tree-lined bluff.
5. Eric first swam at the Flying W in 1978 or 1979. He would have been eleven or twelve years old at the time. In the years following, he swam at the Flying W at least a half dozen times each year; and in 1983 he had been there at least four or five times before the accident.
6. During his previous visits to the Flying W Eric had jumped and dived from the small rock bluff into the river and also jumped and dived from the tree from which he dived on the occasion of his injury. In addition, Eric had swam in other areas of the Current River and had jumped and dived into the river at those locations.
7. On June 19, 1983, a Sunday, Eric and four friends, Tim Williams, Matt Gibbons, Julie Nash, and Barbie Nash drove from their homes in Salem, Missouri to swim at the Flying W. To get there, they drove south on State Highway 19 to Highway K, from which they turned off on an unimproved road; and after briefly crossing privately owned land, they crossed the Park boundary into the Vogel Tract and the Flying W. They arrived about 12:00 noon.
8. On previous occasions Eric had checked the water at the Flying W for depth and obstructions. When the party arrived this time, they got in the water and checked the depth.
9. The deepest part of the swimming hole is near the bluff where its bottom is a solid level ledge of rock. There are no submerged ledges sticking out, nor any logs or boulders that project up from the bottom. At some distance from the bluff, the river bottom gradually angles upwards toward the opposite bank, and the water becomes shallow. There, the bottom is composed of gravel. The gravel bottom is also smooth with no projecting ledges or boulders.
10. Eric previously had taken a water safety course in which he learned that checking water depth and conditions was a safe practice. He knew that jumping or diving into water could be hazardous. He knew the river had a bottom. Eric and his friends estimated that the water depth at the deepest part of the hole ranged from eight to twelve feet. After being satisfied that the depth was safe for jumping and diving, the group commenced to enjoy themselves.
11. The first time Eric climbed the tree, he jumped feet first and did not touch the bottom of the river with his feet upon entry.
12. Eric had seen other people on different occasions dive from the tree.
13. Eric dove from the tree right after Tim Williams made a dive.
14. When Eric dove, he struck his head on the bottom and floated to the surface face down.
15. After Eric dove and injured himself, his friends floated him downstream to a gravel bar. It was apparent that he was seriously injured. He could not move his arms or legs. Matt Gibbons went for help. Ranger Dave Ratliff, Lyle Foley, and Bill Terry responded.
16. An ambulance arrived but stayed on Highway K because the driver did not want *778 to go down the road. Eric was placed on a board and transported three-fourths mile up the hill in one of the Ranger's four-wheel drive vehicles. He arrived at the Salem Memorial Hospital about 4:00 p.m.
17. As a result of his injuries, Eric is a C-5 quadriplegic, and there is little or no hope for further recovery.
18. Neither jumping or diving in the Park were prohibited activities at the time of Eric's accident, nor are they at the present time. Activities such as jumping, diving, swimming, canoeing, and camping could be prohibited pursuant to 36 CFR § 1.5, but only upon a determination that such action is necessary for the maintenance of public health and safety, protection of environment or scenic values, and other purposes, consistent with 36 CRF § 1.1(b), which request any regulations to:
"... fulfill the statutory purposes of units of the National Park System: to conserve scenery, natural and historic objects, and wildlife, and to provide for the enjoyment of those resources in a manner that will leave them unimpaired for the enjoyment of future generations."
19. At the time of Eric's accident, swimming was prohibited in springs and within certain distances of boat launching areas, for ecological and traffic reasons. Appropriate signs were placed for that purpose. There were no "warning" signs placed for otherwise legal activities that might be hazardous.
20. Although activities such as canoeing, swimming, jumping, or diving are not prohibited, Park Rangers did and still do caution visitors when risks are apparent in the Ranger's judgment.
21. Pamphlets and park maps distributed to the public and placed on Park bulletin boards at the time of Eric's injury contained language warning of the hazards of jumping and diving.
22. The Court finds that no Park personnel were present at the Flying W at the time of Eric's accident.

Conclusions of Law
This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 2671 et seq. Venue is proper due to the incident occurring in the Southeastern Division of the Eastern Division of Missouri.
Under the Federal Tort Claims Act, the United States is liable only in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. § 2674. Applicability of this standard is difficult since no private person operates a park open to the public free of admission charge. The nearest analogy is that of a person permitted to go on another's land for recreational purpose without charge.
The Court finds that any negligence on the part of defendant would have to be classified as passive negligence. Clearly, defendant took no affirmative action as a land owner which could be considered negligent. Defendant merely owned land which it allowed the public to use free of charge. Therefore, defendant's negligence, if any, was passive. See, Cunningham v. Hayes, 463 S.W.2d 555.
In passive negligence land owner cases, a visitor is either an invitee, licensee, or trespasser. Eric obviously was not a trespasser. It is a close question as to whether Eric was a licensee or an invitee. The Missouri Courts have historically defined these terms in the following manner:
"... An "invitee" to a place of business is one who goes there either at express or implied invitation of owner or occupant on business of mutual interest to them both, or in connection with the business of owner or occupant which is there being carried on."
"... A "licensee" is one who goes upon property of another, either by express invitation or with his implied acquiescence, not on any business of owner or occupant, but solely in pursuit of licensee's own business, pleasure, or convenience."

Behnke v. City of Moberly, 243 S.W.2d 549 (Mo App 1951)
The Court finds that Eric and his friends entered the Park for their own pleasure and convenience. Although the *779 same can be said of all park visitors, those who enter the Park to take part in planned, organized park programs are invitees; while those who use only the property and none of the facilities, programs, or personnel of the Park are mere licensees.
In reaching this decision, the Court must make narrow yet clear distinctions based upon the nature of the Ozark National Scenic Riverways Park as opposed to publicly held property of a more commercial nature. The Current and Jack's Fork Rivers are natural, spring-fed rivers of great beauty. The United States Government created the Ozark National Scenic Riverways Park to preserve a 134-mile long section of the Current and Jack's Fork Rivers in their natural settings. Unlike municipal golf courses or airports, the vast majority of individuals come to wilderness areas such as the Ozark National Scenic Riverways Park for their own pleasure rather than to take part in a planned, organized, and supervised activity.
This distinction is central to the instant case because while a municipality, which owns and operates an airport for example, can anticipate virtually all activities to be conducted there as well as protect those who utilize the property, the same cannot be said of the owners of a wilderness area. In the Ozark National Scenic Riverways Park, visitors can enter the Park virtually anywhere along the 134 miles of river. Unless the visitors are taking part in planned park activities, there is no way for park personnel to even know how many visitors are in the Park, much less what activities they may be engaged in. To hold that all visitors to the Park are invitees would be an absurd miscarriage of justice.
Applying Missouri law, the Court finds that plaintiff was a licensee when he went into the Park on June 19, 1983, because he entered for his own purposes with the implied permission of the Park Service. See, McVicar v. W.R. Arthur & Co., Inc., 312 S.W.2d 805, 812 (Mo.1958).
In Wells v. Goforth, 443 S.W.2d 155 (Mo. Banc 1969), the Missouri Supreme Court adopted Section 342, Restatement of Torts, (1934) which states:
"... A possessor of land is subject to liability for bodily harm caused to gratuitous licensees by a natural or artificial condition thereon if, but only if, he ...
(a) knows of the condition and realizes that it involves an unusual risk to them and has reason to believe that they will not discover the condition or realize the risk, and
(b) invites or permits them to enter or remain upon the land, without exercising reasonable care (i) to make the condition reasonably safe or (ii) to warn them of the condition and the risk involved therein."
In adopting the 1934 Restatement, the Supreme Court specifically rejected Sec. 342 of the Restatement (Second) (1965) which would have imposed liability for conditions that he should have known in addition to those of which he had actual knowledge. (Goforth, 158).
The Court finds that there was no dangerous condition in the Park that caused Eric's injury. A tree, bluff, and river, by themselves, are not inherently dangerous. They are natural in origin and, properly enjoyed, are of no danger to anyone. Thus, it was Eric's activity which was hazardous and not the condition of the land.
The Court further finds that although the defendant may not have known that diving at the Flying W was hazardous because no injuries had ever been reported prior to Eric's accident, it did warn that swimming and diving in the riverway could cause injuries.
At the time of Eric's accident and before, the Park had published three pamphlets. The earliest published was a green and white map of the Park that contained the words:
"... Swim only in safe, calm water. Don't dive from cliffs or swing from trees as many injuries result each year from these two activities."
That pamphlet was succeeded by a blue and gray map pamphlet that was posted on bulletin boards in the developed areas. It contained this language:

*780 "... Swim only in clear, calm water. Dives from cliffs and tree swings cause many injuries each year."
These map pamphlets were widely distributed by the Park Service to canoe concessionaires in the area, as well as to service groups and organizations.
A third pamphlet titled "River Tips" was handed out by Park Interpreters who conducted evening programs in the developed campgrounds. The programs often included safety "dos" and "don'ts". The River Tips flyer says:
"... Swimmers, check bottom before diving, watch for boats and canoes, NEVER swim alone ..."
Moreover, the Court finds that park personnel warned against dangerous yet legal activities when the situation called for such warnings. The Court finds that such published and personal warnings were sufficient notice to the public that some activities, while not prohibited, were dangerous and should be participated in only with caution. Moreover, the Court finds that Eric knew that diving was dangerous. He and his friends knew that hitting their heads was a distinct possibility. They checked the "hole" at the Flying W to determine the depth and to make sure that no logs or other debris had floated into the hole. They then proceeded to jump and dive, assuming the risk that injury could occur to any of them as a result of their activity.
Plaintiffs argue that the warnings in the printed materials were not sufficient and that signs should have been posted. The Court finds that signs would not have been an effective deterrent given the fact that two of plaintiff's witnesses, close friends, have continued their diving and jumping activities at the Flying W despite Eric's accident.
Additionally, the Court must dismiss plaintiffs' allegations that rangers were guilty of ordinary negligence by not directly warning Eric of the risk of diving. The Court finds the testimony of Park Service employees credible and must conclude that Eric and his friends have mistaken someone in a johnboat for a ranger. The Court finds that all Park personnel were accounted for and none were at or near the Flying W at the time of or shortly before Eric's accident. Further, testimony that park personnel either encouraged diving activities or passively allowed the activity is much too vague to impart liability on defendant.
Finally, plaintiff argues that the hazardous tree should have been removed, as is park policy. As the Court has pointed out, the tree on the bluff is not hazardous. The park's policy is to remove hazardous trees. Testimony indicates that hazardous trees are those that fall into and block the main channel of the river. Such trees are dangerous in that visitors who float the river may be injured through no action or fault of their own when the channel carries them into the fallen tree. The tree in the instant case is of no threat to anyone unless someone climbs the tree and jumps, dives, or falls out of it. Unfortunately, the same can be said for each and every tree in the Park.
Under plaintiff's theory, the park supervisors knew or should have known that jumping and diving out of the tree is dangerous and so should have cut the tree down. Common sense, as well as testimony, indicates that visitors jump and dive out of other trees as well. In order to completely insulate against suits of this nature, the park service would be required to cut down every tree along the banks of the river. Given the purpose and nature of the park, such a solution is untenable.
Despite Eric's thorough knowledge of and river depth and conditions at Flying W, and his appreciation of the risk, he dove twenty-five feet from the tree into the water and struck the bottom. The Park Service did not have any information concerning these conditions superior to Eric's.
The Court concludes that under Missouri Law, the United States is not liable because there was no dangerous condition on the land. The only danger was Eric's own action. The natural conditions were open and obvious, and Eric was well aware of these conditions. In short, Eric assumed *781 the risks of the activity he was engaged in at the time of his injury.
Because the United States was not negligent, there is no need to determine the amount of plaintiff's comparative negligence.
Accordingly,
JUDGMENT WILL BE ENTERED IN THE DEFENDANT'S FAVOR.